UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.R., by and through their *guardian ad litem* Jessica Mendoza, *et al.*, | Case No. 1:21-cv-01593-CDB |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | (Docs. 40, 48, 49) |
| COUNTY OF KERN, *et al.*, | |
| Defendants. | |

Pending before the Court is the motion of Defendants County of Kern and Deputy Philippe Tampinco for summary judgment. (Doc. 40). Plaintiff Ann Cadena and minor Plaintiffs C.R., D.R., and U.R., through guardians ad litem Jessica Mendoza and Feliz Gomez, filed an opposition on June 9, 2023. (Doc. 48). Defendants filed their reply on June 23, 2023. (Doc. 49).[1]

**I.     Background**

In connection with Defendants' motion for summary judgment, the parties filed their own separate statements of undisputed facts. *See* (Docs. 40, 49). Further, Defendants filed an improper reply to Plaintiffs' responses to Defendants' separate statement of undisputed facts. *See* (Doc. 50). No such filing is authorized by the Local Rules. *See* Local Rule 260. Thus, the Court will not consider Defendants' arguments contained therein. In their filing, Defendants also reproduce Plaintiffs' separate statement of undisputed facts and marks each fact as "disputed" or "undisputed," or include evidentiary objections. *See id.* Though any such filing is not contemplated

---

[1] Following the parties' filing of notices consenting to the jurisdiction of a U.S. magistrate judge for all purposes, on October 14, 2025, the action was reassigned to the undersigned pursuant to 28 U.S.C. § 636(c)(1). (Doc. 62).

by Local Rule 260, the Court will consider Defendants' responses to Plaintiffs' separate statement to the limited extent that facts marked as "undisputed" by Defendants are not in material dispute by the parties.

The parties' respective statements of undisputed facts rely in part on footage from Defendant Tampinco's body-worn camera ("BWC"), a video file of which was lodged with the Court. (Doc. 39). To the extent genuine, material disputes exist, the Court will look to the version of the disputed fact most favorable to Plaintiffs, as the non-moving party. *See Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005). The facts referenced below are drawn from those marked as undisputed by Plaintiffs and Defendants, except where noted.

On November 10, 2020, Deputy Tampinco heard over the Kern County Sheriff's Office ("KCSO") radio that two deputies were dispatched to a call regarding a Hispanic male identified by clothing type, pacing back and forth in front of the yard and knocking on the door of 720 Lincoln Avenue in Bakersfield, California, and that the man was unknown to the reporting party. (Doc. 48-1 at 4, Defendants' Statement of Undisputed Facts ("DSUF"), ¶ 10). The person ultimately was determined to be Decedent Daniel Reyes ("Decedent"), who resided at 719 Lincoln Avenue in apartment "C." *Id.* ¶ 18.[2] KCSO dispatch reported over the radio to deputies that it was unknown whether the man was under the influence and whether he possessed weapons. (DSUF ¶ 11). Dispatch announced that the reporting party stated female family members were inside the residence as the male was pacing back and forth in front of the door and began banging on it. *Id.* ¶ 12.[3]

Tampinco realized he was the closest unit and so dispatched himself to the scene and reported as such to the dispatch operator. *Id.* ¶ 13. Tampinco arrived on scene at approximately 8:38 p.m. and, as he arrived and while still in his vehicle, saw on the south side of the road in front of 721 Lincoln Avenue a Hispanic male wearing clothing generally matching the description

---

[2] Plaintiffs do not dispute this fact but, in their separate statement of facts, assert that Decedent lived at 721 Lincoln Avenue. (Doc. 48-1 at 34 ¶ 2). This discrepancy is not material to the Court's decision.

[3] Plaintiffs dispute that Decedent was "engaging in any criminal activity" and state that Decedent "lived at 721 Lincoln Ave. and was simply outside his home." (DSUF ¶ 12). Plaintiffs do not dispute, however, the content of the KCSO dispatch relayed over the radio.

provided by dispatch.  The man was looking westbound on the sidewalk and looked directly at Tampinco."[4]  Tampinco and his patrol car were "easily visible due to the street lighting where he parked."  *Id.* ¶ 14.  Due to the matching clothing description of the man, Tampinco believed him to be the suspect regarding the call for service of a man banging on the door of 720 Lincoln Avenue.  *Id.* ¶ 15.[5]  Tampinco exited his vehicle and walked towards a tow truck, shining his flashlight at Decedent who looked at him.  *Id.* ¶ 16.  Decedent then walked into the gate of the courtyard to 721 Lincoln Avenue, which is between two apartment buildings.  *Id.* ¶ 17.  A long grass courtyard separated the two long apartment buildings and Decedent lived in and at the end of one of the apartment buildings.[6]  *Id.* ¶ 18.  Tampinco stated that the "first part of the courtyard," where he first encountered Decedent, was dimly lit and without his flashlight he would have only seen Decedent's outline; the "latter part of the courtyard" had more lighting from the outdoor lights of the apartments.  *Id.* ¶ 19.

Tampinco identified himself to Decedent as "sheriff's department" and said "stop" and "come over here" but Decedent looked at Tampinco and did not obey his commands and continued walking away.[7]  *Id.* ¶ 20.  Tampinco told Decedent to stop and come to him a second time.  *Id.* ¶ 21.  Tampinco saw a large kitchen knife with a brown wooden handle protruding from the back left side of Decedent's waistband.  Tampinco told Decedent he could see the knife and for him to put

---

[4] Plaintiffs dispute the statement that Decedent "ducked out of view" but do not dispute that Decedent was looking westbound and then looked directly at Tampinco.  (DSUF ¶ 14).

[5] Plaintiffs dispute that Decedent was "engaging in any criminal activity" and state that Decedent "lived at 721 Lincoln Ave. and was simply outside his home."  (DSUF ¶ 15).  Plaintiffs do not dispute, however, Tampinco's perception of Decedent based on his clothes matching the description relayed in the KCSO dispatch.

[6] The 719 Lincoln Avenue address listed in Defendants' statement of facts differs from the 721 Lincoln Avenue address noted in Plaintiffs' separate statement.  Plaintiffs do not object or otherwise provide any comment regarding the use of the 719 Lincoln Avenue address.  *See* (DSUF ¶ 18).

[7] Plaintiffs dispute this fact to the extent that Decedent "understood any of the commands" and objects as speculative whether Decedent disobeyed them; in support, Plaintiffs cite only the BWC.  It is sufficiently clear from reviewing the BWC that Decedent responded with "I don't have a knife" after Tampinco commanded Decedent to "put the knife down."  The BWC shows, at least, that Decedent did understand this command.  *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has discretion in appropriate circumstances to consider other materials, [but] it need not do so").

3

it down.  Decedent responded by saying, "What knife?" and kept walking.  *Id.* ¶ 23.  Tampinco reported on the radio that the Decedent was armed with a knife at approximately 8:40 p.m.  *Id.* ¶ 24.  At the point where Tampinco saw the knife and Decedent was walking away, Decedent was within five to seven feet from Tampinco as Tampinco pointed his firearm at the subject.  Tampinco reported over the radio that he drew his firearm and that the subject was armed with a knife.[8] Tampinco told Decedent for the second time that he could see the knife and to put it on the ground.  *Id.* ¶ 25.  Decedent retrieved the knife with his left hand and then shifted it to his right hand and turned to face Tampinco, and Tampinco told Decedent for a third time to put the knife down.[9]  *Id.* ¶ 26.  Tampinco could see the blade of the knife was six to eight inches long.  Decedent complied with the order and dropped the knife to the ground next to him.  *Id.* ¶ 27.  Tampinco had not, by this point, searched Decedent for weapons.  *Id.* ¶ 28.

Tampinco ordered Decedent to drop to his knees and put his hands on his head, repeating the order two to three times, as Tampinco "wanted the other deputies responding to the call to assist with securing [Decedent] so he could be searched for weapons."  *Id.* ¶ 29.  Decedent turned away from Tampinco and complied with the order by going on his knees but would not keep his hands on his head when instructed to do so.  *Id.* ¶ 30.  Tampinco's firearm was equipped with a flashlight and Tampinco believed it was on; however, the BWC shows it was not on.  *Id.* ¶ 33.  Decedent then stood up with his hands out of view of Tampinco while Tampinco told him to stay on the ground.[10]

---

[8] Plaintiffs dispute the fact that Decedent was armed with a knife.  It is unclear what, precisely, Plaintiffs are disputing as they do not dispute that Decedent had a knife on his body (*see* DSUF ¶ 23), but only that he was "armed" with a knife.  "Armed" is defined as "[e]quipped with a weapon."  *Armed*, BLACK'S LAW DICTIONARY (8th ed. 2004).  The Court finds that the term "armed" encompasses Decedent possessing a weapon on his body, even if that weapon is not in his hand or is not being brandished.

[9] Plaintiffs dispute the fact that Decedent "hesitated" prior to retrieving the knife.  Plaintiff do not dispute, however, that Decedent retrieved the knife with his left hand and then shifted it to his right hand and turned to face Tampinco, and Tampinco told Decedent for a third time to put the knife down.  *See* (DSUF ¶ 26).

[10] It is sufficiently clear from reviewing the BWC that, from the point of initial interaction, Tampinco gives the following commands to Decedent: "can you come over here," "come over here, man," "stop," "stop," "put the knife down," "put the knife down," "turn around, put your hands behind your head," "put your hands behind your head," "stop," "stop," "stop," "do not move," "do not move," "drop down to your knees," "keep your hands on top of your head," "put your legs together, cross your ankles," "cross your ankles together," "cross your ankles together," "cross your ankles together," "cross your ankles together," "put your hands back on top of your head."  Tampinco then reported aloud that the "subject is walking away."  *See Carmen*, 237 F.3d at 1031.

*Id.* ¶ 34. Decedent began walking away, then suddenly sprinted away. Tampinco chased him and reported over the radio that he was in a foot pursuit at approximately 8:41 p.m. and, seconds later, that the subject was walking away. *Id.* ¶ 35. Suddenly, Decedent turned around quickly and faced Tampinco and Tampinco stopped. *Id.* ¶ 36. Tampinco estimates Decedent ran approximately to the midway point of the long grass courtyard separating the two long apartment buildings before turning around to face Tampinco. *Id.* ¶ 37. At the moment of stopping and turning to face Tampinco, Decedent was approximately 12 to 15 feet away from Tampinco. (Doc. 50 at 59-60, Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 13).

Tampinco backpedaled and was still backpedaling when he fired seven or eight shots, and stopped firing when he saw Decedent go down. The time between Tampinco's drawing his firearm and his first shot was approximately seven seconds. (DSUF ¶ 48). The distance between Tampinco and Decedent was approximately six feet when Tampinco fired the shots. (PSUF ¶ 16). Decedent fell to the ground but Tampinco could not see his hands, so he kept his firearm pointed at Decedent and, approximately 11 seconds after discharging the shots, advised dispatch he had been in a shooting and requested medical aid. (DSUF ¶¶ 49-50). At the time, Tampinco was aware that it was normal procedure for KCSO dispatch that his call for medical aid would be relayed to ambulance providers and the County of Kern Fire Department. *Id.* ¶ 51. It is the normal course of procedure at KCSO dispatch that, when a deputy in the field reports that a subject is down and requests medical care, an ambulance and the fire department is dispatched to the scene. *Id.* ¶ 52. Tampinco reported an officer involved shooting at 8:41:14 p.m., which is written as "998" on the service report, and at 8:41:24 p.m., Tampinco reported a subject was down and requested medical aid. *Id.* ¶ 53. At that point, Decedent had not been searched for weapons and had not been handcuffed, and Tampinco was alone at the scene without the assistance of a partner. *Id.* ¶ 54. At 8:41:35 p.m., the first deputy arrived and the second deputy arrived at 8:42:00 p.m. They began providing medical aid to Decedent. *Id.* ¶ 55.

Tampinco was regularly trained according to POST guidelines in courses on force options, arrests, and control, as well as use-of-force policies, including the use of deadly force, contained in policy F-100. He was up to date on training as of the incident. *Id.* ¶ 57.

5

## II.    Standard of Law

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011); accord *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

On summary judgment, each party's position must be supported by: (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *Carmen*, 237 F.3d at 1031. Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Nevada Dep't of Corr v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted). The focus is on the admissibility of the evidence's contents rather than its form. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). The

6

non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252). However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation and citation omitted).

"[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

"The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018). "The record is viewed in the light most favorable to the nonmovants … so long as their version of the facts is not blatantly contradicted by the video evidence[.]" *Id.* (citation omitted); *see Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) ("[F]or purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence.") (emphasis in original).

**III.   Discussion**

In the operative complaint, Plaintiffs assert the following claims under 42 U.S.C. § 1983: (1) unreasonable detention under the Fourth Amendment; (2) excessive force and denial of medical care under the Fourth Amendment; (3) loss of familial relations under the Fourteenth Amendment; (4) municipal liability for (a) ratification; (b) unconstitutional custom, practice, or policy; and (c) failure to train. *See* (Doc. 1). Under state law, Plaintiffs assert claims for battery, negligence, violation of the Bane Act (Cal. Civ. Code § 52.1), and violation of the Ralph Act (Cal. Civ. Code § 51.7). *See id.*

Defendants move for summary judgment on all claims.  In their opposition, Plaintiffs state that they dismiss their Ralph Act claims, as well as their claims of unreasonable detention and denial of medical care.  (Doc. 48 at 13, 17, 27).  Thus, the Court will grant without further discussion Defendants' motion as to the Ralph Act claims and the claims of unreasonable detention and denial of medical care.

Turning first to the claims brought pursuant to federal law, the Civil Rights Act provides:

> Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must prove that the conduct complained of was committed by a person acting under color of state law and that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978).

### A.    Fourth Amendment – Excessive Force

#### i.    *Governing Law*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. Under the Fourth Amendment, a claim asserting that a law enforcement officer used excessive force during the course of an arrest, investigatory stop, or other seizure of a citizen is analyzed under the objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under that standard, "'[t]he force which [i]s applied must be balanced against the need for that force: it is the need for force which is at the heart of the *Graham* factors.'" *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City and Cnty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994), *abrogated on other grounds by County of Los Angeles v. Mendez*, 581 U.S. 420 (2017)).  Courts are required to "balance the nature of the harm and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citations and quotations omitted).

"Force is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

However, under the doctrine of qualified immunity, police officers are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 49 (2018).  In its qualified immunity analysis, a court may use either prong as its starting point and, thus, exercise its "discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

Under the first prong of the analysis, "whether a constitutional right was violated … is a question of fact."  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009); *see Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (explaining that under the first prong of the qualified immunity analysis, the court considers whether the facts show a violation of a constitutional right).  In contrast, "the 'clearly established' inquiry is a question of law that only a judge can decide."  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017); *see Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent," meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 583 U.S. at 63 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).  Stated differently, "[a] right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)) (citation omitted).  A § 1983 plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023) ("There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions.  Nor must § 1983 defendants come forward with precedent showing that the unlawfulness

9

of their conduct was not clearly established."); *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019); *see Rivas-Villegas*, 595 U.S. at 6 (burden is with plaintiff to identify precedent "that put [defendant] on notice that his specific conduct was unlawful").

"For a constitutional right to be clearly established, a court must define the right at issue with specificity and not … at a high level of generality." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (internal quotations and citation omitted). When identifying the right that was allegedly violated, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than all of the factual circumstances surrounding the alleged violation. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1092–93 (9th Cir. 1998). "The Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)).

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)) (per curiam). In other words, a plaintiff bringing an excessive force claim "must [] point to an existing rule that squarely governs the facts at issue and that moves the officer's actions outside the hazy border between excessive and acceptable force." *Hopson*, 71 F.4th at 698 (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).

### ii.    Discussion – Constitutional Violation

In resolving whether Tampinco is entitled to qualified immunity, the Court must engage in the relevant two-step inquiry. The Court first "ask[s] whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the [officers] violated a constitutional right." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (citation omitted). Next, the Court asks "whether that right was 'clearly established' at the time of the alleged constitutional violation." *Id.*

Here, the force at issue is deadly force. "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual and of society, in judicial

10

determination of guilt and punishment." *A. K. H by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (citation and quotations omitted). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis omitted) (citation and quotation omitted).

As to Plaintiffs' excessive force claims against Tampinco, the Court will begin by considering the first prong of the qualified immunity analysis, namely, whether Tampinco's conduct violated a constitutional right.

a.    Severity of the Crime at Issue

The first, nonexclusive *Graham* factor is the severity of the crime at issue. "The 'character of the offense' committed by the suspect is also often an important consideration in determining whether the use of force was justified." *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (citation and quotation omitted).

Here, it is undisputed that Tampinco heard a call over the KCSO radio regarding a subject pacing back and forth in front of a yard and knocking on the door of 720 Lincoln Avenue, that the man was unknown to the reporting party, that it was unknown whether the man was under the influence and whether he possessed weapons, and that the reporting party stated female family members were inside the residence as the male was pacing back and forth in front of the door then began banging on it. (DSUF ¶¶ 10-12). Plaintiffs note the "crime in question was not a violent or serious crime" (Doc. 48 at 15) while Defendants argue that Tampinco believed an attempted burglary or domestic violence situation was in progress. (Doc. 40 at 15).

While the call may have indicated a possible risk of escalating threats or violence without a prompt response, it is clear that the dispatch report did not give Tampinco any reasonable basis to infer a felony crime in progress. Thus, this factor weighs against Defendants. It is, however, one factor only and the Court must consider the totality of the circumstances "from the perspective of a reasonable officer on the scene." *Peck*, 51 F.4th at 887 (citation omitted).

///

///

11

          b.   <u>Whether Decedent Posed an Immediate Threat and Was Attempting to Evade or Resist Arrest</u>

As the facts relating to the second and third *Graham* factors are intertwined, the Court will consider these two factors together.

It is undisputed that Tampinco, after arriving at the scene, identified himself to Decedent as "sheriff's office" and within seconds observed a large kitchen knife with a brown wooden handle protruding from the back left side of Decedent's waistband. Tampinco told Decedent to put the knife down and pointed his firearm at the subject. Decedent retrieved the knife with his left hand and then shifted it to his right hand and turned to face Tampinco, and Tampinco told Decedent for a third time to put the knife down. Decedent ultimately complied with the order and put the knife on the ground next to him. (DSUF ¶¶ 20-27).

Tampinco then gave Decedent a number of surrender-related commands, which Decedent partially complied with. *Id.* ¶¶ 29-33. Eventually, Decedent stood up with his hands out of view of Tampinco while Tampinco told him to stay on the ground. Decedent began walking away then suddenly sprinted away. Tampinco chased him and, after a short chase, Decedent suddenly turned around quickly and faced Tampinco and Tampinco stopped. At the moment of stopping and turning to face Tampinco, Decedent was approximately 12 to 15 feet away from Tampinco. (PSUF ¶ 13).

Tampinco backpedaled as Decedent sprinted towards him and was still backpedaling when he fired seven or eight shots, and stopped firing when he saw Decedent go down. (DSUF ¶ 48). The distance between Tampinco and Decedent was approximately six feet when Tampinco fired the shots. (PSUF ¶ 16). Decedent fell to the ground but Tampinco could not see his hands, so he kept his firearm pointed at Decedent and advised dispatch he had been in a shooting and requested medical aid. (DSUF ¶ 49).

          *1.   <u>Whether Tampinco Knew Decedent No Longer Possessed the Knife</u>*

Notwithstanding Tampinco observed Decedent drop the kitchen knife from his hands upon his commands at their initial encounter, Defendants argue that "Tampinco did not know if [Decedent] had picked up the knife" prior to fleeing Tampinco as "his hands were out of view." (Doc. 40 at 15). During deposition, Tampinco offered that Decedent, immediately prior to fleeing,

had "reached down again like as if he's trying to reach for his waistband or the knife" and that Tampinco did not know whether Decedent retrieved the knife because it was dark. (DSUF ¶ 34) (citing Doc. 40, Ex. H at p. 13). He relatedly attested that, when Decedent turned to confront him following the short foot chase, he presented his closed hands and Tampinco could not see whether Decedent had a knife. (Doc. 40, Ex. H at p. 14). However, there is evidence suggesting Tampinco possibly knew Decedent did not re-arm himself with the knife. Specifically, the BWC, at timestamp "T04:42:05Z," depicts Tampinco stating to arriving deputies approximately 56 seconds after he shot Decedent, "he dropped … there's a knife right over there … I don't know if he still has any weapons on him." The BWC also reflects that during the immediate aftermath, Tampinco quickly changed magazines and kept his firearm trained on Decedent's body.

Although a neighbor attested during deposition that he looked out his apartment window and briefly saw Decedent and Tampinco at some point during their encounter, and shortly afterwards heard a voice warn that he was going to shoot and then gunshots, there is no information before the Court that either this witness or any other witnesses saw either the shooting or Decedent's knife. *See* (Doc. 40, Ex. M).

Viewing all this evidence in the light most favorable to Plaintiffs, the disputed facts would permit a jury to conclude that Tampinco knew, at the time he shot Decedent, that he was not armed with the knife he dropped upon Tampinco's commands prior to the foot chase.

2. *Whether Decedent's Movements Indicated He May Have Been Surrendering*

Tampinco's testimony coupled with the BWC establishes that Decedent, in violation of Tampinco's commands, rose from the ground, began walking away, and quickly sprinted from Tampinco. After approximately five yards of a foot chase, Decedent suddenly turned to face Tampinco, was wearing gloves, and had his hands closed and up by his chest. Decedent then "sprinted straight towards Tampinco and was not trying to go around him." (Doc. 40, Ex. H at pp. 13-14).[11] Tampinco further testified that he did not know whether Decedent was "trying to swing

---

[11] Though Defendants assert that the BWC "clearly shows [Decedent] was close enough to grab Tampinco's gun," a review of the BWC footage does not show any clear indication of this fact. *Id.* The footage is dark and it is difficult to discern the events occurring during Tampinco's pursuit of Decedent

an object at me, trying to punch me, trying to grab my gun; but to me, in my mind, right there there's an imminent threat of death … because I think he's trying to kill me or take my gun to kill me or tackle me to the ground." *Id.*

In the face of these undisputed facts, Plaintiffs attempt to argue that Decedent "had his arms out which could be inferred to mean that [Decedent] was surrendering" based on general references to the autopsy report and deposition testimony of the attending coroner.  (Doc. 48 at 13, 16); (Doc. 48-1, "Plaintiffs' Undisputed Material Facts" ["PUMF"] ¶¶ 23, 24) .  Specifically, Plaintiffs argue that "Gunshot Wound Number 5 to the bicep also provides for the inference that [Decedent] had his hands up in the air.  The only manner in which Gunshot Wound Number 5 could have entered the inside of [Decedent's] body is if [Decedent] had his hands up in the air when [Tampinco] shot him."  (Doc. 48 at 13).  But neither the autopsy report, the deposition testimony of the attending coroner, nor any other evidence identified by Plaintiffs or otherwise creates any basis in fact to infer that Decedent may have been raising his arms in a manner suggesting surrender.

The evidence proffered by Plaintiffs in support of an inference that Decedent was surrendering based on the presentation of his arms to Tampinco as he "sprinted" towards him during the foot chase amounts to, at best, a mere scintilla, which is insufficient to create a triable issue of fact on this issue.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts") (citation omitted); *e.g., Caldwell v. City of Selma*, No. 1:13-cv-00465-SAB, 2014 WL 4275513, at *9 (E.D. Cal. Aug. 29, 2014) ("Defendant argues that the bullet entering the left side of his back is consistent with Plaintiff turning away from the gun when it was drawn. Based upon the evidence presented by the parties, the fact that the bullet entered the left side of Plaintiff's back does not create a triable issue to defeat summary judgment."); *Burgess v. Liles*, No. C 08-4029 SI, 2011 WL 90110, at *6 (N.D. Cal. Jan. 11, 2011) (rejecting a plaintiff's argument that evidence, including autopsy report and coroner's statements, permitted an inference that decedent's movements suggested he was attempting to surrender).

---

and afterwards.  For that same reason, although Plaintiffs' characterization that the BWC does not show Decedent "doing anything aggressive" or was "any form of threat" (Doc. 48 at 13) is accurate, it does not follow that Decedent was neither aggressive nor a threat.

14

### 3. *Whether Decedent Was Moving Towards Tampinco*

Although Plaintiffs argue that the BWC does not show Decedent doing "anything aggressive" or "any other indication" that Decedent "was any form of threat, let alone an imminent threat of death or serious bodily injury" (Doc. at 13), they do not dispute and have failed to identify any facts casting in doubt that (1) Decedent sprinted towards Tampinco after suddenly stopping and turning to him during the foot chase, (2) Decedent was 12 to 15 feet away from Tampinco when he stopped running, (3) Tampinco backpedaled when Decedent sprinted towards him, and (4) Decedent was six feet away when Tampinco discharged his firearm. Because Decedent is not visible for substantial portions of the BWC footage, including the majority of the footage relating to Decedent running away and the events thereafter, including when Tampinco discharges his firearm, Plaintiffs' mere reference to the BWC for the absence of a fact does not permit an inference that Plaintiff was neither aggressive toward nor a threat to Tampinco.

Although they do not dispute that Decedent "sprinted straight toward Tampinco with his arms up" and that Decedent "ran directly at him and was not trying to go around him," Plaintiffs respond to these undisputed facts with a purported "objection" as "self-serving and in violation of Ninth Circuit jurisprudence." (Doc. 48-1, Plaintiffs' response to DSUF ¶¶ 40-41, citing *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014)). In *Cruz*, the Ninth Circuit noted that, in the deadly force context, a "self-serving account by the police officer" cannot simply be accepted, and courts must carefully examine all record evidence to determine the consistency of the officer's story, both internally and with other known facts, including "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.* (citations and quotations omitted). The Ninth Circuit found that there was circumstantial evidence in *Cruz* from which a jury might conclude the officers lied. The Ninth Circuit cited to the following facts: (1) decedent "didn't have a gun, so why would he have reached for his waistband" when surrounded by officers with guns drawn; (2) one of the officers who shot decedent recited the "exact same explanation when he shot and killed another unarmed man"; (3) four officers said they saw decedent reach for his waistband, and a jury may find improbable that four officers had a line of sight; (4) decedent was left-handed, yet two officers saw him reach for his waistband with his right hand; (5) decedent's body was

15

suspended by the seat belt and had to be cut free, potentially putting into question the accounts of him having "emerged fully" from his vehicle" and "turn[ed] to face forward"; and (6) the only non-police eyewitness testimony stated that decedent's feet "made it out of the car" but that decedent was "slipping on the ground, like kind of falling down, as if he were tripping." Considering these facts, the Ninth Circuit found that the district court erred in ruling that only an unreasonable jury could disbelieve the officer's version of events. *Id.* at 1079-80 (quotations omitted; alterations in original).

Plaintiffs identify no similar evidence in this case that would permit a reasonable jury to disbelieve Defendants' version of events in the manner set forth by the Ninth Circuit in *Cruz*. Although the Court noted above the potential dispute between Tampinco's observation to officers arriving after the shooting that "there's a knife over there" and his later testimony he did not know whether Decedent still had the knife when he shot, this evidence standing alone does not reasonably call into question Tampinco's credibility. *Cf. Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1009 (9th Cir. 2017) (finding the record presented "abundant grounds" for a jury to reasonably question Deputy Gelhaus' credibility, listing five instances where the officer contradicted himself regarding material facts, as well as another instance where the other responding officer's testimony contradicted Gelhaus).

In sum, there are no disputed issues of triable fact that Decedent was evading arrest and presented an immediate threat to Tampinco based on his close-in-time possession of a knife, unexpected flight from Tampinco despite numerous commands to surrender, and sprinting suddenly toward Tampinco during the foot chase and quickly closing distance with Tampinco while his arms were outstretched and without Tampinco's sight of what if anything his hands possessed.

c. Availability of Less Intrusive Means

Instead of shooting Decedent dead, Plaintiffs assert that Tampinco "could have used a less than lethal force option such as a taser." (Doc. 48-1, Plaintiffs' response to DSUF ¶ 42). In support, Plaintiffs rely on the opinion of police practices expert Scott DeFoe for the following propositions: Tampinco (1) "failed to immediately create [t]ime and [d]istance after observing [Decedent] was in possession of a knife," (2) made a "poor tactical decision in remaining in an open-air environment

16

that did not afford him cover and concealment," (3) failed to wait for arrival of additional deputies, and (4) unreasonably used deadly force in violation of KCSO policies and procedures, among other conclusions. (Doc. 48 at 11-12); *see* (PUMF ¶¶ 26, 27, 29).

First, Mr. DeFoe's opinion that Tampinco's use of force was unreasonable (PUMF ¶ 29) is inadmissible and disregarded. "[A]n expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation and quotation omitted). "This prohibition of opinion testimony on an ultimate issue of law recognizes that, when an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (alteration, quotation, and citation omitted). Whether or not Tampinco violated Decedent's legal rights is an ultimate issue of law that is not an appropriate subject for expert testimony. *E.g., Contreras v. Gonzalez*, No. 1:18-cv-01101-AWI-SKO, 2020 WL 6887743, at *3 (E.D. Cal. Nov. 24, 2020) ("[E]xperts may not opine, for example, on whether there was probable cause for an arrest"); *Morgan v. City of Los Angeles*, No. 2:17-cv-06693-VAP-JEMx, 2020 WL 6048831, at *3-4 (C.D. Cal. June 23, 2020) (police practices expert could not offer opinion as to whether officer's actions constituted "excessive force" or were "objectively reasonable").

Second, Plaintiffs fail to identify anything in the record that supports Mr. DeFoe's opinions or establishes how Tampinco could have used a less than lethal force option, such as a taser. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn*, 673 F.3d at 876 (citation and quotation omitted). The "less intrusive methods" *Graham* factor weighs "against finding the use of force reasonable" only "if there were clear, reasonable and less intrusive alternatives to the force employed." *Id.* (internal quotation and citation omitted). Such less intrusive methods must be "feasible" alternatives to the force actually employed. *See Bryan v.*

17

*MacPherson*, 630 F.3d 805, 831 & n.15 (9th Cir. 2010).

In the Ninth Circuit, "while it is an unsettled question as to how much weight to give to officers' failure to employ de-escalation factors, an immediate threat to officers' safety can outweigh any consideration of whether officers employed de-escalation techniques." *Galindo v. City of San Francisco*, 718 F. Supp. 3d 1121, 1137 (N.D. Cal. 2024) (citing *Est. of Strickland v. Nevada Cnty*., 69 F.4th 614, 619–20 (9th Cir. 2023)).

As discussed *supra*, there is no genuine dispute of material fact that Decedent unexpectedly fled from Tampinco despite numerous commands to surrender, and after stopping suddenly during a short foot chase, turned toward and sprinted at Tampinco while his arms were outstretched and without Tampinco's sight of what if anything his hands possessed. And Plaintiffs do not present evidence creating a disputed issue of fact about Decedent's intent to surrender. Even resolving in favor of Plaintiffs that Tampinco knew Decedent had dropped the knife he initially possessed prior to fleeing, Tampinco reasonably perceived an immediate risk of harm from Decedent's actions. Assuming Decedent no longer possessed the knife that had been present at his waistband when Tampinco first encountered Decedent, the facts nevertheless present a scenario for which a reasonable officer would perceive an immediate risk to himself and others requiring rapid action.

Further, Plaintiffs neither dispute nor identify evidence to refute that it was reasonable for Tampinco to chase Decedent when he unexpectedly fled and that waiting for other deputies undoubtedly would have increased the likelihood Decedent would have escaped, resulting in possible harm to others. When Decedent suddenly stopped and faced Tampinco, they were separated by 12 to 15 feet and only six feet separated them after Decedent sprinted towards Tampinco when he shot Decedent. Tampinco backpedaled in an attempt to create distance from Decedent.

In opining that Tampinco could have used lesser force, Mr. DeFoe does not address or even acknowledge the relevant factors, such as time, place, distance, logistics of switching from a firearm to a taser, or whether a taser would be effective despite Decedent's attire. *See* (Doc. 48, Ex. 9). Nor does Mr. DeFoe address or even acknowledge Tampinco's relevant testimony – that he considered "transitioning to my baton or something else" but concluded "I don't know if he's still

armed.  So I think it's not safe, it's not feasible to transition … within just about two or three seconds, I can't even make that decision, he runs, he sprints straight at me."  (Doc. 40-10 at 11); *see* (Doc. 48-2, Ex. 1, at 18) (Q: "did you ever think about using a less than lethal force option?" A: "Yes … I quickly considered if it would have been feasible to transition to my baton, or a Taser, or to simply tackle him."). The only other evidence Plaintiffs note in support of their contention that Tampinco could have used a taser is a photograph of Tampinco's taser.  *Id.*, Ex. 5.  Therefore, Plaintiffs do not establish a genuine issue of material fact as to whether Tampinco could have used less intrusive means.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Est. of Serrano v. Trieu*, No. C-14-4081 MMC, 2016 WL 1089225, at *7 (N.D. Cal. Mar. 21, 2016) (granting summary judgment and rejecting argument that officer's use of deadly force was unreasonable given his possession of taser and pepper spray; reasoning "defendants have presented undisputed evidence that Deputy Trieu considered using his Taser and pepper spray and, given a number of concerns, reasonably concluded that neither presented a viable alter"); *Caldwell*, 2014 WL 4275513, at *9 (granting summary judgment and rejecting argument that officer's use of deadly force was unreasonable given his possession of pepper spray and baton; "Plaintiff was within two to three strides of Defendant Burgamy [when he shot] …  use of deadly force was justified by his reasonable belief that Plaintiff presented an immediate threat of serious physical harm or death."). *Cf. Singh v. City of Phoenix*, 124 F.4th 746, 755 (9th Cir. 2024) (expert's opinion that officer could have used taser instead of shooting created disputed issue of fact where the plaintiff did not attempt to flee, never threatened or ran at the officers, never moved quickly, and had stopped moving before he was shot by officers).

### d.  Whether Warnings Were Given

Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis.  *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

The undisputed facts establish that Tampinco identified himself to Decedent as "sheriff's office" and said "stop" and "come over here," told Decedent to stop and come to him a second

19

time, and told Decedent he could see the knife and for him to put it down.  After seeing the knife and pointing his firearm at Decedent, Tampinco told Decedent for the second time that he could see the knife and to put it on the ground.  (DSUF ¶¶ 20-25).  Tampinco ordered Decedent to drop to his knees and put his hands on his head, repeating the order two to three times.  After at first complying with Tampinco's orders, Decedent rose from a kneeling position, began walking away, then suddenly sprinted away.  *Id.* ¶¶ 29-35.  The BWC footage shows that, as Tampinco begins to chase Decedent, he yells "stop, sheriff's office," before yelling "stop" twice, then "I'm gonna shoot you," and then "stop" three times before discharging his firearm.  Plaintiffs also do not dispute or otherwise present facts calling into doubt that Decedent's sudden sprint towards Tampinco prompted him to backpedal as Decedent quickly closed the distance between the two from approximately 12 feet to six feet, and that Tampinco fired as he gave his final warning to Decedent to "stop."

Even considering the facts in the light most favorable to Plaintiffs, the Court concludes that this factor weighs in favor of finding Tampinco's use of force reasonable.  *See Est. of Serrano*, 2016 WL 1089225, at *8 ("Deputy Trieu twice warned Ms. Serrano to 'stop,' and the consequences of failing to comply were apparent, in that Deputy Trieu had his firearm trained on Ms. Serrano when he instructed her to 'stop' the second time.  [] Plaintiffs do not argue, nor could a jury reasonably find, it was feasible for Deputy Trieu to issue more fully stated warnings, as the encounter lasted only 12.5 seconds, during the entirety of which time Ms. Serrano was chasing Deputy Trieu); *see also Garcia v. Cnty. of Napa*, No. 21-cv-03519-HSG, 2023 WL 355148, at *8 (N.D. Cal. Jan. 17, 2023) (finding sufficient warning where officer backpedaled and yelled "stop" three times, loudly and clearly, with escalating intensity, over about six seconds while keeping his gun trained on decedent, and without a final warning that the officer was going to shoot, noting that "the open and obvious brandishing of a firearm combined with multiple verbal commands could lead a reasonable officer to conclude that decedent had been sufficiently warned"), *aff'd sub nom. Garcia through AG v. Cnty. of Napa*, No. 23-15056, 2024 WL 1734125 (9th Cir. Apr. 23, 2024).

*       *       *       *       *

In sum, drawing all reasonable inferences from the record in Plaintiffs' favor, the totality of

20

the circumstances demonstrates that Tampinco had probable cause to believe Decedent posed an imminent risk of serious harm.  For the foregoing reasons, the Court concludes a reasonable jury could not find that Tampinco violated the Fourth Amendment by fatally shooting Decedent.  *See Anderson*, 477 U.S. at 249–50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party … If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.") (citations omitted).

However, even if a reasonable juror could find as such, qualified immunity bars Plaintiffs' claims.

### iii.    Discussion – Clearly Established Right

Resolving all disputed facts in the light most favorable to Plaintiffs, they have failed to carry their burden of demonstrating that the unlawfulness of Tampinco's conduct was "clearly established" at the time.  *See Hopson*, 71 F.4th at 692 (finding constitutional violation was not obvious when officers pointed a gun at plaintiff and forcefully extracted him from his car without identifying themselves as law enforcement officers); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (constitutional violation not obvious where police officer shot plaintiff while he was retreating into his apartment and allegedly no longer posed a threat of harm); *Baxter v. City of Hemet*, 728 F. Supp. 3d 1127, 1144 (C.D. Cal. 2024) (finding officers entitled to qualified immunity where plaintiff failed to identify either binding authority or a consensus of cases demonstrating officers would have had "fair notice" their conduct was unlawful).

Plaintiffs identify 23 cases in support of their argument that the unlawfulness of Tampinco's conduct was clearly established at the time.  (Doc. 48 at 20-23).  Of these 23 cases, five are nonbinding as out-of-circuit and district court cases, which are not dispositive of the Court's qualified immunity analysis.  *See S. B. v. Cnty. of San Diego*, 864 F.3d 1010, 1016 (9th Cir. 2017) ("Plaintiffs argue that two district court decisions (within the Ninth Circuit but outside of California) provided clear warning to [defendant].  However, district court decisions — unlike those from the courts of appeals — do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.  Moreover, even if district court decisions could clearly

establish the law for purposes of qualified immunity, the cases on which plaintiffs rely are insufficient.") (citations and quotations omitted).

Upon review, the other 17 cases were decided by the Ninth Circuit before 2020, the year of the incident, and thus are relevant here for purposes of putting law enforcement officers on notice. However, three of these cases are unpublished.  The Court has reviewed all cases cited by the Plaintiff including those that are unpublished and evaluated their holdings in consideration of that fact.  *See DeFrancesco v. Robbins*, 136 F.4th 933, 939 (9th Cir. 2025) ("And though we have held that unpublished decisions ... may inform our qualified immunity analysis, rarely have we concluded, absent any published opinions on point or overwhelming obviousness of illegality, that the law was clearly established on the basis of unpublished decisions only.") (citation and quotations omitted).

### 1.  *Plaintiffs' Cited Authority*

The Court finds that all of the cases cited by Plaintiffs are factually distinguishable or otherwise frame the constitutional right at issue too generally or broadly.  *See, e.g.*, *J.L.D. v. City of Los Angeles*, 555 F. App'x 670, 671 (9th Cir. 2014) (reversing summary judgment due to disputed fact as to reasonableness of second shot fired when decedent had fallen backwards after first shot); *Glenn*, 673 F.3d at 874 (reversing summary judgment where officers deployed deadly force against individual who did not flee and threatened only himself with a pocket knife which he did not brandish at anyone); *Gelhaus*, 871 F.3d at 998 (law was clearly established that officers could not "[shoot] without warning, without objective provocation, and while the gun [in decedent's hand] was trained on the ground" where decedent was "walking normally and appearing composed and non-threatening" and turned toward officer without making "any sudden movements"); *Harris v. Roderick*, 126 F.3d 1189, 1193-94 (9th Cir. 1997) (law was clearly established that a police sniper atop a hill could not shoot suspects who presented no immediate threat, without any announcement or indication of the presence of law enforcement); *Cruz*, 765 F.3d 1076; *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075-76 (9th Cir. 2017) (officers who deployed second volley of shots at suspect who feel to ground following initial nine-round volley and who was not at the time making threatening gestures not entitled to qualified immunity).

22

While the cases cited by Plaintiffs and noted above plainly fail to establish that "every reasonable official would have understood" that Tampinco's conduct violates the constitutional right to be free from excessive force (*Rosenbaum*, 107 F.4th at 924), other cases warrant closer examination.

In *Longoria v. Pinal County*, defendants were not entitled to qualified immunity given it was clearly established at the time that a police officer may not deploy deadly force against an unarmed and nondangerous suspect. In that case, officers shot a suspect dead after a lengthy car chase during and after which the suspect acted erratically and expressed to an officer he had nothing to live for and wanted to die. The suspect ultimately exited his vehicle and stood facing the officers with one hand behind his back; eight officers were on the scene with guns drawn. The suspect did not comply with orders to show his hands and a sergeant shouted for officers to use "less lethal" force at least twice, while other officers shouted that the suspect only had a wallet behind his back. Some officers fired beanbag rounds at the suspect and another tased him. After the suspect flinched, turned halfway to his right, faced his car and put his empty hands above his head and with his back to the officers, an officer shot and killed him. *See Longoria v. Pinal Cnty.*, 873 F.3d 699 (9th Cir. 2017).

The *Longoria* facts contrast sharply with those at issue here. The suspect in that case never presented a weapon and, in fact, some of the officers reported before lethal force was deployed that the suspect only had a wallet in his hands. Here, Tampinco was on his own, the suspect initially was armed, fled, and abruptly sprinted toward Tampinco with his arms outstretched and closed to within six feet as Tampinco backpedaled.

The Ninth Circuit in another case cited by Plaintiffs (*S.R. Nehad v. Browder*) found an officer was not entitled to qualified immunity where he "responded to a misdemeanor call, pulled his car into a well-lit alley with his high beam headlights shining into Nehad's face, never identified himself as a police officer, gave no commands or warnings, and then shot Nehad within a matter of seconds, even though Nehad was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to Browder or anyone else." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019). Thus, the case cannot be said to "squarely govern" the facts here (*Hopson*,

71 F.4th at 698) given Tampinco responded to a call, exited his vehicle, identified himself as a member of the sheriff's office, and gave Decedent numerous commands to drop the knife Decedent had visible on his body and surrendering.  Decedent then ran away from Tampinco before stopping approximately 12 to 15 feet away from him.  The BWC shows Tampinco warning Decedent that he will shoot him, then stopping and backpedaling before shooting Decedent.  The distance between them when Tampinco fired was approximately six feet.

In *S.B. v. County of San Diego*, the Ninth Circuit found that a reasonable jury could conclude that an officer shot a suspect, reported as being mentally ill and intoxicated, after he complied with officers' commands to get on his knees but reached for a knife in his pocket.  At the time he reached for the knife, the suspect was approximately six to eight feet away from officers and officers did not order him to drop the knife or warn that he was about to be shot.  In contrast to the facts here, the suspect in *S.B.* was inside his home and complied with the officers' orders, was kneeling when he grabbed a knife, and was shot without any command to comply or warnings about officers' intent to deploy lethal force.  Similarly, in *Deorle v. Rutherford*, the Ninth Circuit found an officer was not entitled to qualified immunity when he shot a suspect with a lead-filled beanbag round, without a command to comply or warning, who was merely walking at a "steady gait" toward a police officer holding possibly a can or bottle of lighter fluid but otherwise was physically compliant and generally followed all the officers' instructions.

### 2. *Other Controlling Authority*

A case published by the Ninth Circuit after briefing was complete here on Defendants' summary judgment motion implicates a somewhat comparable set of facts that occurred in 2019, the year prior to the incident here (*Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023)).  In *Waid*, two officers responded to a domestic violence call at the home of Robert Anderson.  Anderson's minor children exited the house and spoke to one of the officers, informing him their parents were fighting, their mother needed an ambulance, and no weapons were in the house other than a BB gun.  After calling for medics, the officers announced themselves as they entered the home with the trail officer drawing his weapon.  Anderson shouted and the officer with his firearm drawn ultimately sighted Anderson at the end of the hallway, commanding him get on the ground.  The

first officer, now just behind, drew and pointed his firearm. Anderson ignored the officers' commands and ran down the short hallway at the officers, prompting the officers to shoot Anderson.

The Ninth Circuit noted that "Anderson was on his feet when he was shot" and "was quickly approaching [the officers] while ignoring [an officer's] command to get on the ground. Even if Anderson's hands remained at his side and he never reached for a weapon, Anderson was rapidly advancing on the officers and could access their weapons if he was not stopped." *Id.* at 390. The Ninth Circuit noted that the events occurred in a narrow hallway with no barrier between Anderson and the officers and "even the facts most favorable to Anderson suggest that he ignored multiple commands and was quickly approaching the officers." *Id.* at 391-92. In light of those facts, the Ninth Circuit held the officers were entitled to qualified immunity because "none of the cases on which plaintiffs rely are sufficiently analogous" and "they cannot put a reasonable officer on notice that the use of deadly force here would be unconstitutional." *Id.* at 392.

The facts here arguably are more favorable to finding that qualified immunity applies than those in *Waid*. There, the officers had information that there were no weapons in the home and the officers never saw Anderson with a weapon, nor observed his hands in a threatening posture as he approached them.

*    *    *    *    *

Accordingly, Plaintiffs have failed to meet their burden to show that the right at issue was clearly established and put Defendants on notice that the specific conduct was unlawful. Thus, Tampinco is entitled to qualified immunity.

**B.    Fourteenth Amendment – Loss of Familial Relations**

The Fourteenth Amendment protects liberty interests in the companionship between parents and children. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013). "Only official conduct that shocks the conscience is cognizable as a due process violation." *Id.* (citations and quotations omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. Cnty. of San*

25

*Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

Defendants assert that the "purpose to harm" standard applies here as Tampinco did not have time for "actual deliberation." Defendants argue that, from the time Tampinco arrived on scene to the time he reported the subject was armed with a knife, approximately one minute and 20 seconds had elapsed; approximately 47 seconds passed between then and the commencement of the foot pursuit; and the shooting only 14 seconds later. (Doc. 40 at 20-21). In opposition, Plaintiffs offer in a conclusory fashion and without citation to authorities that Tampinco had time for actual deliberation and no legitimate purpose in shooting Decedent. (Doc. 48 at 19).

Plaintiffs' claims of deprivation of familial relationship fail for the same reasons as noted above. Namely, Plaintiffs have failed to present any triable issue of fact as to the purported deliberate indifference of Tampinco during his encounter with Decedent. *See Schwarz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation. Therefore, because there is no evidence that either Undersheriff Mineau or Lassen County was deliberately indifferent to Parker's serious medical needs, Schwarz's claim for loss of familial association—which is predicated on their purportedly unconstitutional care of Parker—likewise fails as a matter of law.") (internal citation omitted).

Further, even if a genuine dispute of material fact remained that Tampinco's conduct conceivably violated Decedent's constitutional rights, a jury could not reasonably find that such conduct "shocks the conscience" as is necessary to sustain Plaintiffs' due process claim. *See Garcia*, 2023 WL 355148, at *9 ("There is nothing to suggest that Sgt. Ackman shot Mr. Garcia for a purpose other than his 'perception of the need for self-defense,' even if mistaken.").

Thus, the Court will grant Defendants' motion as to the claims of deprivation of familial relationship.

///

**C.      Municipal Liability**

Defendants argue Plaintiffs fail to identify genuine disputes of material fact sufficient to establish triable issues relating to *Monell* liability.  (Doc. 40-1 at 24-26); *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)).  Pursuant to *Monell*, a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.  Instead, the local government "is subject to suit under § 1983 only 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.'"  *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1096-97 (9th Cir. 2013) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).  To establish a municipality's liability under *Monell*, a plaintiff "must show that (1) she was deprived of a constitutional right; (2) the [municipality] had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation."  *Harmon v. City of Pocatello*, 854 Fed. App'x 850, 854 (9th Cir. 2021) (quoting *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001)).  "The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality."  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal and concluding citation omitted).

Regarding a failure to train, mere negligence in a municipal entity's training of its employees is not enough.  "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees."  *Id.* (citing *Blankenhorn v. Cnty. of Orange*, 485 F.3d 463, 484 (9th Cir. 2007)).

Here, as discussed *supra*, Plaintiffs have failed to present facts sufficient to allow a reasonably jury to find a constitutional violation and, as such, Plaintiffs' *Monell* claims fail.

27

However, even if Plaintiffs had presented such facts regarding an underlying constitutional violation, Plaintiffs fail to present any issue of fact as to the existence of a custom, practice, or policy relating to excessive force, failure to intervene, or failure to train.

First, Plaintiffs invoke a "ratification" theory of liability and "failure to train" theory of liability. (Doc. 48 at 24-25). Plaintiffs premise both theories on the conclusory argument, unsupported by any cited authority, that the County failed to discipline Tampinco for the allegedly unconstitutional shooting of Decedent. *Id.* Beyond this assertion, however, Plaintiffs' argument is undeveloped. "A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004) (citation omitted). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it. The policymaker must have actual knowledge of the constitutional violation and affirmatively approve of it – a failure to overrule a subordinate's actions is insufficient to support a § 1983 claim." *Id.* (citation and quotation omitted). Plaintiffs identify no facts, disputed or otherwise, to support a finding or permit the drawing of an inference that the County of Kern affirmatively approved Tampinco's actions. Nor do they identify any facts from which an inference could be drawn that any constitutional injury would not have resulted if the County properly trained Tampinco. *Benavidez*, 993 F.3d at 1153.

Second, in support of their separate theory of liability that a County policy was the driving force behind Tampinco's unconstitutional conduct, Plaintiffs proffer a complaint and stipulated judgment obtained in a lawsuit brought in 2020 by the California Office of the Attorney General ("AGO") against the County of Kern. (Doc. 48, Exs. 10-11). Although Plaintiffs do not rely upon or refer the Court in their opposition papers to any identified portions of these documents, they argue generally that they reflect a "well settled practice of [the County of Kern] allowing their deputies to shoot and kill unarmed people." (Doc. 48 at 24-25). They further argue the AGO's investigatory findings applied to a variety of areas, including, generally, "using unreasonable force" and "failure to exercise appropriate management and supervision of its law enforcement officers" (*id*. at 25). Such generalized references to allegations and investigatory findings without any linkage between those allegations and findings to the facts and circumstances in this case fails to

28

present any triable issue of fact that the County of Kern engaged a pattern of constitutional violations arising from a custom, practice, or policy. *See, e.g., Lake v. City of Vallejo*, No. 2:19-cv-01439-DAD-CSK, 2025 WL 1735543, at *20 (E.D. Cal. June 23, 2025) (taking judicial notice of certain documents, including a stipulated judgment between the California Attorney General and Vallejo Police Department, and granting summary judgment on *Monell* claims; noting "[b]eyond asking the court to take judicial notice of these documents, plaintiff does little to explain how these documents lend support to his *Monell* claim, and he provides no pin cites to direct the court to any particular pages of these documents that may reflect relevant evidence on summary judgment").

Accordingly, Plaintiffs' municipal liability claims against the County of Kern for ratification; unconstitutional custom, practice, or policy; and failure to train fail. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000) (plaintiff cannot demonstrate the existence of a policy based on a single occurrence of unconstitutional action committed by a non-policymaking employee); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("Davis has failed to establish that there is a genuine issue of material fact regarding the existence of a policy of inadequate training, inadequate medical treatment of prisoners, or deliberate indifference to the use of excessive force. A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee."); *see also Hutton v. City of Berkeley Police Dep't*, No. 13-cv-03407-JCS, 2014 WL 4674295, at *14 (N.D. Cal. Sept. 9, 2014) ("In this case, Plaintiff has not offered any evidence showing a pattern of constitutional violations. Rather, the only evidence in the record relates to the alleged unconstitutional acts in this case. Such evidence does not suffice to establish *Monell* liability.").

### D.     State Law Claims

Plaintiffs' remaining claims are brought pursuant to state law. The Court may decline supplemental jurisdiction over state law causes of action under 28 U.S.C. § 1367(c) if "(1) the claim

raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the … values of economy, convenience, fairness, and comity." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1999). The Ninth Circuit has "frequently recognized that when federal claims are dismissed before trial, supplemental state claims should ordinarily also be dismissed." *Avelar v. Youth And Fam. Enrichment Servs.*, 364 F. App'x 358, 359 (9th Cir. 2010) (citing, *inter alia*, *Jones v. Cmty. Redevelopment Agency of City of Los Angeles*, 733 F.2d 646, 651 (9th Cir. 1984)).

Here, the Court has resolved all of the federal claims over which it has original jurisdiction. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). While the Court recognizes that litigation of a new suit places a burden on Plaintiffs, they make no showing to persuade the Court that retaining jurisdiction over state law claims is warranted here. *See* (Doc. 48). The remaining claims rely only on state law and, thus, a state court is in a better position to address said issues. *See, e.g.*, *Est. of F.R. v. Cnty. of Yuba*, No. 2:23-cv-00846 WBS CKD, 2025 WL 1549104, at *7 (E.D. Cal. May 30, 2025) (declining supplemental jurisdiction after granting summary judgment on all federal claims).

Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and they will be dismissed without prejudice.

## IV.    Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (Doc. 40) is GRANTED as to Plaintiffs' claims brough pursuant to 42 U.S.C. § 1983 and California's Ralph Civil Rights Act (Causes of Action 1-6, 10).

2.  Plaintiffs' remaining state law claims (Causes of Action 7-9) are DISMISSED without prejudice.

3.  The Clerk of the Court is directed to enter judgment accordingly and to CLOSE this case.

IT IS SO ORDERED.

Dated:   **March 6, 2026**

_____
UNITED STATES MAGISTRATE JUDGE

31